JOCELYN B. PESTOTNIK, Appellee, v. G. F. BALLIET, Appellant.

No. 46240.

1048

JUNE 15, 1943.

OPINION MODIFIED AND REHEARING DENIED SEPTEMBER 27, 1943.

Guy A. Miller, of Des Moines, and F. W. Ganoe, of Boone, for appellant.

Doran, Doran & Doran, of Boone, for appellee.

MANTZ, J.—This case grows out of a collision which took place about 4 p. m., August 14, 1941, at a highway intersection in the town of Ogden, Boone County, Iowa. The collision was between a gravel truck operated by DeWayne Pestotnik and a Studebaker coupé operated by G. F. Balliet, the defendant herein. The truck was traveling northward on paved Highway No. 169, while the coupé was traveling eastward on a paved cut-off beginning from Highway No. 30 just west of Ogden and ending at No. 169. This cut-off enabled travelers to take No. 169 south from Ogden without going through the business district of that place. This cut-off had been recently constructed and was not officially opened for travel, but the evidence shows that it was being used by the public generally.

In the collision the wife of the defendant lost her life, while the driver of the truck, DeWayne Pestotnik, and his wife, who was riding with him, were severely injured. The wife, Jocelyn B. Pestotnik, plaintiff herein, brings suit on her claim for damages in one count and as assignee of her husband's claim in another count. Her claim, in essence, is that at the time and place of the collision the defendant was negligent in that he failed to yield the right of way to the truck at the intersection and that he was further negligent in that he was driving his automobile at a high and excessive rate of speed without bringing it to a stop before entering the intersection, and that, as he was entering an arterial highway and also on the left of the truck operator, it was his duty to stop before entering the intersection.

The defendant denied generally the allegations of both counts; denied that in operating his automobile he was negligent; claimed that both plaintiff and her husband were guilty of contributory negligence; and alleged that the negligence of

the driver of the truck was the sole and proximate cause of the injuries suffered by both the plaintiff and her assignor.

When the plaintiff had rested, the defendant moved the court for a directed verdict, setting up various grounds therein. Among the grounds set forth in his motion was that the evidence failed to show that the defendant was negligent as charged by plaintiff, and further that plaintiff had failed to show that both she and her husband were free from negligence contributing to the damage and injury complained of. Boiled down, the motion of defendant to direct a verdict in his favor was based upon the claim that plaintiff had not made a showing sufficient to warrant the court in submitting the case to the jury. This motion was overruled and was later renewed when all the evidence was in and both sides had rested, the grounds of said renewal being substantially the same as in the former motion. This motion was overruled. Exceptions were taken to both adverse rulings.

The cause was submitted to the jury and later that body returned a verdict in favor of plaintiff and against the defendant for the sum of $15,000. Thereupon the defendant filed a motion to set aside the verdict and to grant a new trial. This motion was overruled and the defendant has appealed.

Defendant urges various grounds for reversal. We will consider the errors argued in the order as set forth by the defendant.

The first ground for reversal urged by the defendant is that the court erred in refusing to sustain defendant's motion to direct a verdict in favor of defendant, for the reason that plaintiff had failed to show by a preponderance of the evidence or by any competent evidence that the collision occurred as alleged in her petition and as testified to by witnesses, ''for that the physical facts proved and established on the trial conclusively show that the collision could not have happened as claimed by the plaintiff in her petition, and they are entirely and wholly inconsistent with any other theory than that the witnesses must have been mistaken.''

The import of such claim is that under the facts shown there was no jury question; that the plaintiff had failed to sustain her pleaded allegations of negligence; that the evidence

given by the witnesses for plaintiff was directly contradicted by the physical facts; that such witnesses must have been mistaken; that the physical facts are controlling. Much of the evidence touching this matter is in direct and positive conflict: the stopping; the approach of the various vehicles to the intersection; their speed; their position at or about the time of the impact. One thing is certain—the gravel truck and the coupé collided somewhere in the intersection, and when the dust had settled and the vehicles had come to rest, the coupé was over in a residence yard, headed northeast, with some uprooted shrubs in front, and the truck was headed southeast and was overturned and the back part of it was on top of the coupé. The trial court, when commenting upon the evidence in ruling upon the motion for directed verdict, said:

"But one thing I think is very certain in this case,—that there must have been a tremendous momentum somewhere in those moving vehicles. When you stop to think what happened to them, ending up with a heavy gravel truck actually lying on top of the other car, which was smashed to smithereens,—the fire hydrant broken off,—the bushes in the yard torn up by their roots, and these persons almost done to death, all of them,—one of them I guess was dead,—I say there must have been speed and momentum aplenty to have accomplished such results."

A careful study of the record shows that the able trial court in the above comment did not overstate the situation. The truck driver states that as he came to the intersection he was on the right-hand side of the pavement and that he reduced his speed to twenty miles per hour; that as he approached the intersection he looked to the west about one hundred sixty feet and saw no car approaching; that there was no car in the intersection as he entered it; that as he was past the center of the intersection he glanced to the west and saw a car approaching about thirty feet away and that in his opinion this car was traveling about forty miles per hour; that he tried to turn his truck to his right and that there was a collision, and at such collision the left front end of his truck was north and east of the intersection. There was other evidence from which it could be in-

ferred that the truck was first into the intersection. The defendant testified that he came from the west and stopped a short distance west of the intersection; that he intended to turn to the south on Highway No. 169; that he then drove out into the intersection and again stopped, and looking south saw the truck coming north and astride the center line; that he was then about ten feet out into the intersection; that in order to avoid a collision with the truck he turned to the left and was struck by the truck and went over through and past the northeast corner of the intersection, and that when he stopped the overturned truck was on top of his automobile.

Another trucker as a witness testified that he was following the Pestotnik truck and had followed it from Perry; that he kept a short distance behind and looked ahead and observed that the Pestotnik truck was on the right-hand side of the pavement and slowing down as it approached the intersection; that he saw the truck enter the intersection and did not see any car in the intersection or approaching it. He further stated that as the Pestotnik truck went over (upset) it was on the right-hand side of No. 169 and about the center of the intersection. Several witnesses testified that the two vehicles came together somewhere near the center or to the northeast corner of the intersection, and when stopped the coupé was on a residence parking and pushed up against some trees and shrubbery. Both vehicles were badly damaged. An examination of the record convinces us that the court was right in submitting the case to the jury. A fact question, pure and simple, was involved and a citation of cases is of little value. The conflict in the evidence necessitated submission to the jury.

In connection with the motion of defendant that the court was in error in submitting the case to the jury on the grounds that there had been a failure of proof to establish the claim of negligence and also that there was a failure to show freedom from contributory negligence on the part of Mrs. Pestotnik and her husband, we desire to quote briefly from the remarks of the trial judge in overruling such motion. In part, the court said:

"I have frequently, as the members of the Bar here know, expressed my faith and confidence in the American jury, and

it seems to me that in this case more than any other I have ever tried, I am very glad that the jury is here to relieve me of the responsibility;' and in this case, as seldom before, I think the jury will rise to its full dignity and authority, and function in determining the controverted facts; indeed it seems to me that if I ever heard or tried a case properly for the jury, this is certainly it.''

 The defendant complains of the action of the court in refusing to strike from the record and to admonish the jury not to consider the testimony of DeWayne Pestotnik wherein that witness testified that the Balliet coupé was approaching the intersection at a speed of about forty miles per hour. The witness states that he saw the car coming at a glance—''out of the corner of my left eye''—and that he was able to estimate its speed. He states that when he first saw the coupé it was about thirty feet from the intersection. We must take cognizance of the fact that estimates of distances, speed, and the sequence of many happenings—especially in automobile collisions—are relative. Such happen in a split second. The fact that a witness bases his estimate of speed upon a hasty or hurried glance and upon observations for a longer interval does not necessarily bar his testimony, it simply goes to its weight. We think the court did not err in refusing to strike the testimony. Short v. Powell, 228 Iowa 333, 291 N. W. 406; Eby v. Sanford, 223 Iowa 805, 273 N. W. 918.

 The defendant further complains that the court erred in giving to the jury Instruction No. 7, said instruction dealing with the relative rights of the parties at the intersection in question. Said instruction reads as follows:

''Returning now to the alleged negligence of the defendant, to which plaintiff ascribes the accident, the first charge is to the effect that defendant failed to yield the right of way at the intersection in question to the truck in which she was riding, and which was then being operated by her husband. It appears without dispute that the road on which plaintiff was riding was a primary or so-called 'through' or arterial highway, whereas the road on which defendant approached the intersec-

1054

tion was a secondary road. It also appears without dispute that the truck was approaching the intersection from the right, in relation to the car operated by the defendant.

"On this point the statutes provide that where two vehicles are approaching on any public street or highway so that their paths will intersect and there is danger of collision, the vehicle approaching the other from the right shall have the right of way.

"The statutes further provide with reference to this situation that the driver of a vehicle shall stop at the entrance to a through highway, and shall yield the right of way to other vehicles which have entered the intersection from said through highway, or which are approaching so closely thereon as to constitute a hazard, but having so yielded, the driver may then proceed cautiously, and with due care may enter said through highway.

*"Under both of these statutes it is clear that the truck in which plaintiff was riding had the right of way through the intersection in question, and under ordinary circumstances would have a superior right over the defendant to go through, and that it was defendant's duty to hold back and permit the truck to pass through in safety.* [Italics supplied.]

"This does not mean that defendant was required to stop and wait indefinitely for cars approaching on the primary road at great distances and beyond danger of collision; but it does mean as the statutes expressly say, that if the two cars in this case approached the intersection so nearly at the time that there was danger of collision; or, as otherwise put, if when defendant arrived at the intersection plaintiff's truck was already in the intersection, or approaching it so closely as to constitute a hazard, it was defendant's duty to stop and wait until the truck had safely passed through.

"A violation of these statutes is deemed by law to be negligence of itself; and if in this case you find that the defendant did in fact enter the intersection in violation of these express statutory provisions, then he would be guilty of negligence in the respect thus charged by the plaintiff."

Instruction No. 7 is rather long and somewhat complicated, but we think it correctly sets forth the law applicable to the

rights and duties of operators about to enter intersections and is proper under the evidence appearing in the record and has application to intersections where highways are of the same class and those wherein a through or arterial highway is intersected by a secondary highway. While the part italicized could well have been omitted, yet we do not believe its inclusion was reversible error.

In the first instance, where the highways are of equal class, if both vehicles arrive at approximately the same time, the one approaching from the right has the preference. [Code, 1939, section 5026.01.] Prior to the enactment of chapter 175, Acts of the Forty-ninth General Assembly, a different rule applied to such intersections.

In the second instance, that is, where an arterial highway is involved, the law requires the drivers of vehicles about to enter a through highway to stop and yield the right of way to other vehicles which have entered the intersection from the arterial highway, or which are approaching so closely on said through highway as to constitute a hazard. [Code, 1939, section 5026.03.] In the abstract, it would seem that the above would come within the designation of ''ordinary circumstances'' as used in the instruction. The statement in the instruction, ''Under both of these statutes it is clear that the truck in which plaintiff was riding, had the right of way through the intersection in question,'' is simply a statement of the relative rights of the drivers or operators of vehicles at intersections under ordinary conditions. This instruction tells the jury that it is for them to determine which vehicle had the right of way under the facts shown. The paragraph following the one italicized qualifies and explains the preceding paragraph in its application to the evidence. Therein the jury was told that it was their province to consider the evidence, and, after applying the rules of law as laid down, to determine the ultimate fact, that is, which party had the right of way.

There was much conflict in the evidence as to the position of the vehicles just before and at the time of the collision. The operator of the truck states that he was about halfway through the intersection as the defendant's car came into it. The defend-

ant states that as he approached the intersection he stopped about at the sidewalk line on the west and looked for vehicles on No. 169; that he started to drive into it with the purpose of turning south; that he then saw the truck something like five or six hundred feet south; that he stopped about ten feet west of the center of the intersection and looked and saw the truck about fifty to seventy-five feet away; that he then started to turn to the north, when he was hit by the truck. Under such a conflict, we think that it was clearly a jury question as to who had the right of way, and we do not think that the instruction given in any way foreclosed the right of the jury to determine that disputed question under the evidence before them.

It is hardly necessary for us to say that instructions must be read as a whole, and in passing upon the sufficiency of the instructions, all instructions given must be considered. Lathrop v. Knight, 230 Iowa 272, 297 N. W. 291; Tallmon v. Larson, 226 Iowa 564, 284 N. W. 367; Rogers v. Jefferson, 226 Iowa 1047, 285 N. W. 701; Olson v. Cushman, 224 Iowa 974, 276 N. W. 777.

Defendant argues that the statutes relative to the law of the road did not apply in this case, in that the record fails to show that either the cut-off or No. 169 was open for vehicular travel.

There is some evidence that there were signs on the cut-off and over on Highway No. 30 to the effect that the cut-off was under construction, but we find nothing in the record to indicate that Highway No. 169 was officially closed. There is the evidence of the witness Mrs. Rulifson, who lived close to the cut-off, that it was not officially open on the day of the accident. Defendant admits that while coming onto the cut-off from No. 30 he noticed the sign, "Road under construction." We do not think that construction work on the highways would nullify or render inoperative the rules of the road.

The defendant claims that in instructing the jury as to the measure of damages and the elements thereof the court was in error in stating in Instruction No. 14 that the jury might allow, as an element of damages to plaintiff, the humiliation and embarrassment arising from scars and facial disfigurement grow-

ing out of the injuries suffered by her at the collision. It is claimed that plaintiff as a witness did not claim that the scars caused her any embarrassment, and that in the face of her statement it was error to permit the jury to make allowance for such.

The evidence shows that plaintiff is a woman twenty-four years of age. The physician who was called to treat her described the injuries which she suffered in the collision, particularly those to her face. His testimony was that they were numerous and severe and that many scars were left and that they were deep and permanent. There was one close to three inches long across her nose; one over an inch long by the side of one eye; another close to two inches long from the eye to the hairline; there was a loose flap of skin near the crease in her nose; one on her lower lip fully an inch long. In view of the fact that these numerous scars will go with the plaintiff all her life, it seems to us that it was proper for the jury to be the judge of whether or not such would embarrass or humiliate. We can see no error in the instruction.

We think that the case was one for the jury and that defendant had a fair trial. The case is affirmed.—Affirmed.

GARFIELD, C. J., and MULRONEY, WENNERSTRUM, OLIVER, SMITH, BLISS, and HALE, JJ., concur.

MILLER, J., takes no part.